**MJS AND ASSOCIATES, L.L.C., A Texas Limited Liability Corporation, Appellant**

v.

**Judy MASTER, RN and Matthew Master, Appellees**

**NO. 12-15-00219-CV**

Court of Appeals of Texas, Tyler.

Opinion delivered September 7, 2016

Michelle Meriam, for Appellant.

Joseph M. Callow Jr., Jerry W. Baker, for Appellees.

Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.

## OPINION

BRIAN HOYLE, Justice

This case involves the aftermath of a multimillion dollar federal false claims lawsuit. MJS and Associates, L.L.C. appeals from a summary judgment in favor of its former employee Judy Master and her husband, Matthew Master. In three issues, MJS asserts that Judy Master's conduct was not protected by the federal False Claims Act, there is a fact question regarding whether Master's conduct caused MJS's damages, and MJS presented more than a scintilla of evidence to support each of its claims and defeat the Masters' no evidence motion for summary judgment. We affirm.

## BACKGROUND

MJS is a healthcare consulting firm, engaged in compliance auditing of home health care companies in multiple states. In March 2007, Judy Master was hired as a nurse consultant assisting with billing audits. Because she had access to private medical information, she was required to sign a confidentiality agreement and an

employment agreement requiring nondisclosure of information and documents. She worked exclusively on compliance audits of a company named LHC Group, Inc. MJS had been hired to review LHC's confidential records and determine if it was in compliance with Medicare rules and guidelines. Master found that LHC was not in compliance with federal law. Master resigned from MJS on June 11, 2007.

In July 2007, based on information obtained while employed by MJS, Master filed a *qui tam* suit in a Louisiana federal district court pursuant to the federal False Claims Act, naming LHC as defendant.[1] The suit, which was sealed pursuant to the statute's requirements, alleged that LHC wrongfully obtained substantial funds from government healthcare programs, primarily Medicare, through false claims made in connection with its home health care service facilities over a ten year period. In 2011, LHC and the federal government entered into a settlement pursuant to which LHC agreed to pay sixty-five million dollars. Master received a twelve million dollar fee pursuant to the federal statute for her part in alerting the government to LHC's actions.

About two years after that suit was filed, LHC terminated its contract with MJS. MJS had no knowledge of the *qui tam* lawsuit until it was unsealed in August 2011. A few months later, MJS sued Master, her husband, Matthew Master, and Joel Hesch, the Masters' former attorney in the *qui tam* litigation. It asserted claims for breach of contract, violation of the Texas Trade Secrets Act,[2] breach of fidu-

---

1. *See* 31 U.S.C. § 3730 (2010).

2. Both parties cite to the Texas Trade Secrets Act. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001-.008 (West Supp. 2016). However, that statute did not go into effect until September 1, 2013, and applies to the misap-

propriation of a trade secret made on or after that date. A misappropriation of a trade secret made before that date is governed by the law in effect immediately before the effective date of the statute. Act of April 23, 2013, 83rd Leg., R.S., ch. 10, §§ 3-4, 2013 Tex. Gen. Laws 14.

ciary duty, conversion, tortious interference with a contract, conspiracy, and fraud based on Master's pursuit of the *qui tam* suit against LHC. The Masters and Hesch filed a general denial and asserted numerous affirmative defenses.

Pursuant to MJS's motion to nonsuit Hesch, the trial court rendered an order dismissing MJS's claims against Hesch. MJS filed a no evidence motion for summary judgment requesting dismissal of the Masters' affirmative defenses. The trial court granted the motion as to certain defenses and denied the motion as to all other issues raised in the motion. The Masters filed a combined no evidence and traditional motion for summary judgment, which the trial court granted "in all things."

### Summary Judgment

In its second issue, MJS asserts that the trial court erred in granting summary judgment on the basis that the Masters negated the element of causation as a matter of law. It contends that the Masters' evidence, Josh Proffitt's declaration, is not based on personal knowledge and not competent summary judgment evidence. It further argues that Spears's affidavit contradicts the Proffitt declaration, raising an issue of material fact. Finally, it asserts that the Masters' evidence does not address MJS's allegations that it was also damaged "because its current and potential customers fled after Master's complaint was made public" by a 2011 article, and that Master should be disgorged of improper benefit at MJS's expense. In its third issue, MJS contends that the trial court erred in granting a no evidence summary judgment against MJS because it submitted more than a scintilla of evidence to establish each disputed element of its claims.

### Standard of Review

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex.2007). After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX. R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged element. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). A no evidence summary judgment is essentially a pretrial directed verdict and is therefore reviewed by the same legal sufficiency standard applicable to a directed verdict. *Id.* at 581; *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005). The entire record must be reviewed in the light most favorable to the nonmovant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence and inferences unless reasonable jurors could not. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex.2013). A no evidence challenge will be sustained when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. *Wal–Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex.2006) (per curiam); *Forbes*

*Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex.2003). Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). When a party has moved for summary judgment on both traditional and no evidence grounds, we typically first review the propriety of the summary judgment under the no evidence standard. *See* Tex. R. Civ. P. 166a(i); *Ridgway*, 135 S.W.3d at 600.

## Applicable Law

■ To recover damages for breach of contract, the breach must have been a substantial factor in causing those damages. *Jerry L. Starkey, TBDL, L.P. v. Graves*, 448 S.W.3d 88, 109 (Tex.App.–Houston [14th Dist.] 2014, no pet.); *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 796 (Tex.App.–Dallas 1992, writ denied). A loss results from a breach of contract if the loss is the natural, probable, and foreseeable consequence of the breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex.1981). A plaintiff suing for misappropriation of trade secrets must establish that it suffered an injury resulting from the defendant's conduct. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex.App.–Austin 2004, pet. denied). To recover damages in a fraud cause of action, the plaintiff must show that the fraud caused its injury. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997). To prevail on a claim of breach of fiduciary duty, a plaintiff must prove, in addition to the existence of the fiduciary relationship and a breach of that duty by the defendant, that the breach caused damages to the plaintiff. *Holden v. Holden*, 456 S.W.3d 642, 659 (Tex.App.–Tyler 2015, no pet.). To recover for conversion, a plaintiff must prove damages that are the proximate result of the defendant's conversion. *United Mobile Networks, L.P.*

*v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997) (per curiam). To establish intentional interference with a contract, the plaintiff must show a willful and intentional act of interference that was a proximate cause of the plaintiff's damages. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex.2002).

■ Proximate cause consists of two elements, cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). The tortious conduct must constitute a cause in fact, meaning that the alleged act was a substantial factor without which the injury would not have occurred. *Id.* The defendant's act is not a substantial factor if it does no more than furnish a condition that makes the injuries possible. *Stanfield v. Neubaum*, No. 15–0387, 494 S.W.3d 90, 97–98, 2016 WL 3536865, at *4 (Tex. June 24, 2016); *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex.2004). The conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *Mason*, 143 S.W.3d at 799. Proximate cause cannot be established by mere guess, conjecture, or speculation, but rather must be proved by evidence of probative force. *Stanfield*, 494 S.W.3d at 97–98, 2016 WL 3536865, at *4.

■ An injury is shown to be foreseeable if a person of ordinary intelligence and prudence would have reasonably anticipated it under the circumstances. *Doe*, 907 S.W.2d at 478. Sometimes a defendant's conduct is not a proximate cause of the plaintiff's injuries because subsequent conduct of a third party interrupts or supersedes the defendant's actions. *See Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450–52 (Tex.2006). An intervening cause can destroy the causal connection between the original tortious act and the harm, even if the original tortious act is

the "but for" cause of the intervening cause. *Stanfield*, 494 S.W.3d at 99, 2016 WL 3536865, at *6. A true superseding cause is one that alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly tortious act. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex.2009). Factors we consider include whether the original tortious act caused the intervening force to occur and whether the tortious act operated with the intervening force in creating the harm. *Stanfield*, 494 S.W.3d at 99, 2016 WL 3536865, at *5.

### Analysis

█ MJS contends that it suffered damages when LHC terminated its contract with MJS, the contract was terminated due to Master's actions, and therefore Master's actions caused MJS's damages. The Masters' motion for summary judgment asserts that there is no evidence that MJS's damages were caused by Master's acts. The motion is supported by a "declaration" of Josh Proffitt, Chief Compliance Officer for LHC. In his declaration, Proffitt explained that as Chief Compliance Officer, he is responsible for "implementing and overseeing compliance auditing and monitoring procedures that are designed to ensure compliance with LHC policies and applicable federal and state laws and regulations." His position qualified him to have personal knowledge concerning facts leading to LHC's decision to terminate its contract with MJS and perform compliance audits internally. *See Barham v. Sugar Creek Nat'l Bank*, 612 S.W.2d 78, 80 (Tex.Civ.App.–Houston [14th Dist.] 1981, no writ) (affiant's position as vice president and cashier of bank qualified him to have personal knowledge regarding the facts surrounding the dishonored check at issue). Accordingly, Proffitt's declaration, including his explanation that LHC's decision to internalize its compliance auditing function was not based on the *qui tam* complaint filed by Master against LHC, is competent summary judgment evidence. This evidence shows that any damages MJS may have suffered due to the loss of its contract with LHC were not caused by Judy Master's having taken documents from MJS and using them to pursue a *qui tam* action as alleged by MJS.

█ Once the Masters filed their no evidence motion, the burden to provide evidence raising a fact question on causation was on MJS. *See Phan Son Van v. Pena*, 990 S.W.2d 751, 753 n. 2 (Tex.1999). In response, MJS presented the affidavit of Jan Spears, president and chief executive officer of MJS. In her affidavit, Spears explained that MJS produced records in response to a federal subpoena and three days later "LHC cancelled the contract with MJS without providing any reason or justification as to why." She also stated that MJS never received any complaints from LHC about its services. Finally, she said that the "Declaration of Josh Proffitt is materially untrue as to the facts and circumstances giving rise to the termination of MJS's services." None of these statements raise a fact question. Even assuming the truth of the first two statements, they do not rebut Proffitt's explanation for terminating the contract with LHC. The mere fact that LHC terminated its contract three days after MJS disclosed documents is not evidence of a causal link. Such a leap would be speculation. *See Doe*, 907 S.W.2d at 477. The third statement is a conclusory opinion not supported by facts. *See James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 439 (Tex.App.–Dallas 2006, no pet.).

MJS also asserted that it was damaged when an article was published in an industry periodical discussing the *qui tam* suit and disclosing the identity of the relator. An article entitled "LHC Group dinged for $65 million in False Claims Act settlement with DOJ" was published in the October 10, 2011 issue of "Home Health Line." MJS claimed the negative publicity resulted in a decline in revenues and profit and the loss of its business reputation and goodwill. In support of this argument, it relies on Spears's affidavit and a report by James W. Henderson, an economist.

Spears's affidavit included the following statements:

> "The revelation of information and allegations contained within the October Home Health Line article triggered a wave of negative publicity for MJS and a subsequent decline in revenues and profit."

> "[T]he Home Health Line article resulted in a significant negative impact to MJS which caused a drastic decline in revenue."

> "Immediately after the article I noticed another sharp decline in business. MJS lost several substantial clients within a short timespan thereafter . . . ."

> "In short, the Home Health Line article was virtually a death sentence to MJS's involvement in the business."

> "Despite the attempts to generate new business, I noticed a sharp decline in the amount of phone calls and contacts that MJS was receiving at its business which directly correlated to a loss of revenue."

> "The article in "Home Health Line" that implicated MJS would not have been published without the breach of contract and stealing of records from MJS and subsequent filing of a qui tam complaint by Judy Master."

> "If not for Judy Master's theft, conversion, and misappropriation of confidential MJS documents and information, Judy Master would not have been the relator in the qui tam complaint and MJS would not have lost its business with LHC and would not have lost additional business and income by way of negative publicity."

■ These statements indicate that MJS's business declined shortly after the "Home Health Line" article was published. Although MJS argues that the decline in business was due to the article, which Spears claims would not have been published if Master had not filed the *qui tam* suit, MJS brought forward no evidence directly connecting the decline in business with Master's actions or with publication of the article. There is no evidence identifying any potential clients who received the publication or any who chose not to do business with MJS due to the contents of the article. Where there is no factual context for conclusions, the statements do not constitute more than a scintilla of evidence. *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688–89 (Tex.2006) (per curiam). Spears's testimony is conclusory, based on her subjective belief and unsubstantiated speculation and assumptions. This testimony is no evidence of causation. *Doe*, 907 S.W.2d at 477.

■ Henderson, the economist, drafted an "economic damages report" dated January 22, 2015. In it, he states that the purpose of the report is "to examine the financial history of MJS and Associates and provide estimates of the financial losses associated with the LHC contract termination in 2009 and the unsubstantiated allegations of wrongdoing on the part of MJS in October 2011." Within the general financial history section of the report, Henderson states that an article was pub-

lished in October 2011 identifying Master, an MJS employee, as the "LHC whistleblower." Henderson opined that "[t]his revelation triggered a wave of negative publicity for MJS and a subsequent decline in revenues and profit." He explained that the medical billing line fell forty-five percent by the end of 2013 and the training component of sales fell by over seventy-five percent by the end of 2013. In the financial projections portion of the report, Henderson explained that the 2009 LHC contract termination and the September 2011 public disclosure of the whistleblower's relationship with MJS are the two events related to the damages estimate. In his conclusion, Henderson states that, "[b]ased on the resulting calculations, the total economic damages resulting from the loss of the LHC contract and the public revelation of the whistleblower's identity, MJS lost $2,036,450 in past income and future value."

Henderson's report is faulty because he assumes the very "fact" he purports to prove, that the termination of the LHC contract and publication of the article caused the decline in business. Certainly Henderson was able to quantify the losses directly attributable to the lost LHC contract, but that does not speak to the cause of the lost contract. Henderson looked at the decline in revenues between October 2011 and the end of 2013 and assumed there was no explanation for the decline other than the "wave of negative publicity" triggered by the article. Henderson's speculation is no evidence of causation. *See Doe*, 907 S.W.2d at 477.

Henderson's report and the article itself indicate that there were other sources of negative publicity. The article that MJS has identified as allegedly leading to its lost business was published in October 2011. Yet, Henderson refers to the September 2011 public disclosure of the whis-

tleblower's relationship with MJS. As sources, the article references the September 30 United States Justice Department announcement, "the false claims suit," the settlement, and LHS's announcement of the settlement. The author of the article would have been unable to write the article without a source providing the information he reported on.

We acknowledge that the article commented on the potential role MJS may have played in the activities leading up to the federal lawsuit against LHC. The article stated that "some of the suit's allegations also seem to represent a black eye for the consulting firm MJS Associates ...." The article referenced the federal lawsuit, saying it alleged that "Spears directed her compliance manager to alter audit results to indicate claims met reimbursement standards ...." However, there is no evidence that any MJS client or potential client relied on the article, as opposed to another publicly available source, in determining whether to do business with MJS. *See Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 131–32 (Tex.App.–San Antonio 1999, no pet.). To the extent MJS asserts that the article led to its decline in revenue, there is no evidence of a causal link, only an inference so slight that it is a guess. *See Ridgway*, 135 S.W.3d at 601.

█ Moreover, even if the decline in business could be attributed to the article, it would not follow that Master's acts of collecting and providing the information upon which the *qui tam* suit was based caused the article's author to write the article, which merely reported on a federal lawsuit relevant to the publication's subject matter. The article, as well as other publicly available sources of the information, operates independently of Master's acts. Master's acts may have created the condition that allowed the negative publici-

ty to occur, but her acts did not actively contribute in any way to the injuries allegedly caused by the publicity. *See Stanfield*, 494 S.W.3d at 103, 2016 WL 3536865, at *9; *Mason*, 143 S.W.3d at 799. Merely furnishing the condition making injuries possible does not establish that the ensuing harm was a reasonably foreseeable result of her acts. *Stanfield*, 494 S.W.3d at 100, 2016 WL 3536865, at *7. Accordingly, her acts were not a substantial factor in bringing about the harm. *Id.* at 99, 2016 WL 3536865, at *6. Publication of the article was not "brought into operation" by Master's acts and therefore supersedes Master's actions. *See Hawley*, 284 S.W.3d at 857. We conclude that MJS's declining business is too remote from Master's conduct to constitute legal cause. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991). Therefore, Master's acts were not the proximate cause of MJS's damages. *See Dew*, 208 S.W.3d at 452.

■ Accordingly, there is no evidence that Master's participation in the *qui tam* proceeding, as well as her acts leading up to that proceeding, caused LHC to cancel its contract with MJS or caused MJS to lose business due to the publication of the "Home Health Line" article. The trial court did not err in granting summary judgment in favor of the Masters on all of MJS's causes of action.[3] We overrule MJS's second and third issues. We need not address MJS's first issue. *See* TEX. R. APP. P. 47.1.

### DISPOSITION

We **affirm** the judgment of the trial court.

---

**3.** MJS alleged a cause of action for conspiracy "to convert and misappropriate" information. Conspiracy is not an independent cause of action but requires an underlying tort. *Zarzana v. Ashley*, 218 S.W.3d 152, 162 (Tex. App.–Houston [14th Dist.] 2007, no pet.).