

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00593-CV

Alvin M. **BURNS** and I.M. Burns,
Appellants

v.

**DIMMIT COUNTY, TEXAS**, Hakim Dermish, Roberto L. Ramirez, Edward Dryden, Eusebio Cantu Torres, Eusebio Torres, Jr., Gladiator Energy Services, LLC, Hope Balderas, Juan Morales Balderas, and Lucia Balderas Lopez,
Appellees

From the 293rd Judicial District Court, Dimmit County, Texas
Trial Court No. 12-07-11738-DCV
Honorable David Peeples, Judge Presiding[1]

Opinion by:      Rebeca C. Martinez, Justice

Sitting:         Sandee Bryan Marion, Chief Justice
                 Rebeca C. Martinez, Justice
                 Irene Rios, Justice

Delivered and Filed: May 15, 2019

REVERSED AND RENDERED IN PART; MODIFIED IN PART; AFFIRMED IN PART

This case involves a myriad of claims and counterclaims asserted by numerous parties against one another. All of the claims arise from disputes concerning the ownership, use, or control of streets, alleys, water lines, and pipelines in the unincorporated town of Catarina, Texas ("Townsite"). Because of the number and complexity of the issues, and because the case was tried before a visiting judge not based in Dimmit County, the trial was conducted in intermittent

---

[1] Judge David Peeples sitting by assignment.

segments over the course of more than a year. In June 2016, the court signed a twenty-page final judgment, from which five parties have appealed in various respects.[2]

The issues on appeal fall roughly into seven categories of claims: (1) attorney disqualification; (2) property rights in Townsite streets and alleys; (3) use and ownership of a water system underlying those streets and alleys; (4) statutory abandonment of various streets and alleys; (5) tortious interference with a prospective contract; (6) breach of contract; and (7) attorney's fees.

**Facts**

In 1925, Catarina Townsite Company filed a plat ("1925 Plat") in the Dimmit County real property records, creating Catarina Townsite. It granted to the public an easement to use the roads and alleys[3] depicted on the plat for "ordinary, non-profit, highway purposes." It reserved for itself the exclusive right or privilege to use those roads and alleys for any purpose for profit, and listed several examples of such uses. It also reserved the right to close or abandon any road or alley by obtaining the consent of the owners of property fronting the road or alley to be closed or abandoned.

Two years later, Catarina Townsite Company executed a deed ("1927 Deed") conveying to Catarina Water Supply Company a 400-foot by 370-foot parcel of land ("Rectangle"). That deed also conveyed "all easements, rights, licen[ses] and privileges" Catarina Townsite Company owned or held to use Townsite roads and alleys

> for the purpose of erecting, constructing, operating and repairing thereon and/or removing therefrom water mains and pipes, irrigation canals, flumes, pipes and/or ditches, and such other purposes as are incident, so far as the same are incident, to

---

[2] Alvin Burns and Merle Burns are appellants and cross-appellees; Dimmit County, Roberto Ramirez, and Edward Dryden are appellees and cross-appellants; Hakim Dermish, Eusebio Cantu Torres, Eusebio Torres, Jr., Gladiator Energy Services, LLC, Hope Balderas, Juan Morales Balderas, and Lucia Balderas Lopez are appellees.

[3] The 1925 Plat and subsequent deeds use the phrase "roads and alleys." The parties in their pleadings and in the course of this litigation have used the phrase "streets and alleys." No one assigns any significance to this difference in terminology and we see none. For accuracy, however, we will use "roads and alleys" when referring to the content of the 1925 Plat or the relevant deeds.

the operation of a water works and/or irrigation system to serve Catarina Townsite and adjacent lands.

In addition, the 1927 Deed conveyed to Catarina Water Supply Company certain physical equipment (such as pipes and water mains) then owned by Catarina Townsite Company and used in connection with operating a water works and irrigation system.

Shortly after the 1927 Deed was executed, the Townsite became an incorporated municipality. It ceased to function as an incorporated municipality at some later point in time. The record does not reveal precisely when that occurred, but it is undisputed that it was long before this litigation began.

The Rectangle, physical equipment, and certain rights were conveyed to various owners over the course of the next three decades. In 1960, Merle Burns ("Merle") acquired the Rectangle, and "all appurtenances thereto belonging," by deed from its then-owners ("1960 Deed").[4] The 1960 Deed also conveyed to Merle certain physical equipment then being used in connection with a well located on the Rectangle. For the next few decades, Merle operated a water system to supply potable water to Townsite residents.

In 1996 and 2004, Merle conveyed to Catarina Water Supply Corporation ("CWSC")[5] pipeline easements along and adjacent to specified Townsite streets and alleys ("Pipeline Transfer Easements"). Merle reserved the right to use the existing water lines in those easements "for the purpose of [his] personal use; however, [Merle] shall not use the existing pipeline to provide water for public use[,] such use shall be limited to [Merle's] personal use and use for agricultural purposes." CWSC later conveyed the interests it acquired in the Pipeline Transfer Easements to

---

[4] The Rectangle, as conveyed to Merle, was somewhat reduced in size from the original Rectangle, measuring 300 feet by 370 feet rather than 400 feet by 370 feet.

[5] This is a different entity than the Catarina Water Supply Company, which acquired the Rectangle in 1927 from Catarina Townsite Company.

Dimmit County. Merle ceased using his water system to supply potable water. He began instead to supply water to oilfield operators for purposes such as fracking.

In 2011, Merle conveyed to his son, Alvin Burns ("Alvin"), all of his easement rights "as a successor of the Catarina Townsite Company to the roadway and alleyway easements" in the Townsite ("2011 Deed"). In addition to citing the use of those easements for erecting, constructing, operating and repairing and/or removing pipelines, water mains and pipes, the 2011 Deed recites that it conveys the right to use the easements for other purposes, such as telephone and telegraph lines, railroads and railway lines, and motor buses. In this deed, Merle reserved the right to use the water line easements "for [his] personal, commercial, and agricultural use."

The 2011 Deed was corrected in 2014 ("2014 Correction Deed") to replace the description of the property being conveyed with a metes and bounds description of the Rectangle "together will all appurtenances thereto belonging," and a listing of physical equipment then being used in connection with a well located on the Rectangle. The 2014 Correction Deed expressly excepted from the conveyance the pipeline easements conveyed to CWSC in 1996. The 2011 Deed was again corrected in 2015 to append an exhibit which was previously omitted.

The controversies in this case all stem from the parties' differing interpretations of what easements, rights, and privileges Merle and Alvin (collectively, "Burnses") own or possess as a result of the conveyances described above. The record is replete with testimony relating instances of Alvin preventing others' use of Townsite streets and alleys by physically blocking access, summoning the sheriff and threatening to have perceived trespassers arrested, employing verbal and physical intimidation, and, on at least one occasion, displaying a gun. The Burnses at one point asserted fee simple ownership of the Townsite streets and alleys, authority abandoned during the course of this litigation. They maintain, however, that they have exclusive rights to use Townsite streets and alleys for for-profit purposes, easement rights to obstruct those streets and alleys, and

even the right to close or abandon those streets and alleys upon obtaining the consent of the adjacent landowners (which in some instances would be the Burnses, themselves).

Alvin filed this lawsuit in 2012 against Dimmit County, Rosetta Resources, Inc. ("Rosetta"), CWSC, and others "for the continued and consistent criminal trespassing, interference, use and enjoyment and/or wrongful taking of [his] real property to wit . . . the public streets or roadways, easements and/or alleys or alleyways located in the townsite of Catarina, Dimmit County, Texas."

Through various amended pleadings, counterclaims, and interventions, the lawsuit grew to encompass over a dozen parties and a multitude of causes of action. Pertinent to this appeal are claims for declaratory judgment asserted by the Burnses, Hope Balderas, Juan Morales Balderas, Lucia Balderas Lopez, Roberto Ramirez, Edward Dryden, and Hakim Dermish; claims of statutory abandonment of Townsite streets and alleys asserted by the Burnses; a claim for tortious interference with a prospective contract asserted against Alvin by Ramirez, Dryden, and Dermish; a claim for breach of contract asserted against Merle by Ramirez and Dryden; and claims by Dimmit County, Ramirez, Dryden, and Dermish for attorney's fees.

Additional facts concerning the parties' claims, as well as the trial court's rulings on those claims, are discussed below in conjunction with the particular issues on appeal to which they relate.

**Discussion**

*Attorney disqualification*

Alvin and Merle contend that the law firm of Langley & Banack, Inc. ("Langley & Banack") should have been disqualified from representing Dimmit County in this case. They further contend that, if this court sustains this issue, the judgment must be reversed and the entire case remanded for a new trial. We therefore address this issue first.

Alvin initiated this lawsuit as sole plaintiff on July 23, 2012. In his original petition, he alleged that he was fee simple owner of Townsite streets, alleys, and easements. He also claimed certain property rights arising from a judgment in a previous case filed by Merle. Alvin complained that the named defendants wrongfully interfered with his asserted property rights in a variety of ways. He specifically alleged that Dimmit County caused him harm by informing landowners and potential landowners that Alvin does not have any right or claim to the disputed property (i.e., Townsite streets, alleys, and easements).

Dimmit County filed its original answer on August 24, 2012. That answer was signed by an attorney with the law firm of Langley & Banack. Almost nine months later, on May 6, 2013, Alvin filed a motion to disqualify that law firm from representing Dimmit County, or any other defendant, in this lawsuit. In that motion, Alvin stated that it was "quite a shock" to see that Langley & Banack was representing Dimmit County because that firm previously represented Merle "in matters involving exactly the same issue: Burns' ownership of property rights in and to his lands within Catarina Townsite." In fact, Alvin alleged that Langley & Banack represented Merle on these issues specifically against Dimmit County. Alvin alleged that Langley & Banack should be disqualified under Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct because it previously represented Alvin and/or Merle in a substantially related matter and because its representation of Dimmit County was reasonably likely to involve revelation or use of Alvin's and/or Merle's confidential information to their disadvantage. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05, 1.09, *reprinted in* TEX. GOVT CODE ANN., tit. 2, subtit. G, app. A.

The trial court held a hearing on the motion to disqualify on June 20, 2013. Five days after that hearing, Alvin filed an amended motion to disqualify asserting the same grounds for

disqualification.[6] Merle purported to join this motion "by way of intervention." Merle did not, however, file a plea in intervention until March 10, 2014, nine months later.

The trial court heard additional evidence and argument on the disqualification issue on April 14, 2014. On April 23, 2014, the court signed an order denying the amended motion to disqualify. The court concluded in its amended findings of fact and conclusions of law that the contention that Langley & Banack had a conflict of interest or that it should have been disqualified was waived. The Burnses challenge the legal and factual sufficiency of the evidence to support the court's finding of waiver. Dimmit County counters that the court's ruling is reviewed for abuse of discretion.

We agree that a trial court's decision on attorney disqualification is reviewed for abuse of discretion. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 514 (Tex. App.—San Antonio 2013, pet. denied). This standard applies in the context of waiver as well as the merits of a motion to disqualify. *See id.* at 515 (court did not abuse its discretion by finding waiver motion to disqualify); *HECI Expl. Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 629 (Tex. App.—Austin 1992, writ denied) (same). "A trial court acts within its discretion when it correctly applies the applicable law and its decision is not unreasonable, arbitrary, or made without any reference to guiding rules or principles." *Zaffirini*, 419 S.W.3d at 514 (internal quotation marks omitted). One such guiding rule or principle, however, is that the decision be based on evidence:

> Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion. The trial court does not abuse its discretion, however, if there is some evidence of a substantive and probative character to support the decision or if reasonable minds could differ as to the result.

---

[6] Alvin alleged in his original motion to disqualify that the Langley & Banack attorney who signed Dimmit County's pleadings would be a fact witness at trial. The amended motion omits this allegation.

*Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied) (citations omitted).

The Burnses contend that the waiver issue is governed by *Jernigan v. Langley*, 111 S.W.3d 153 (Tex. 2003), in which the supreme court held that a physician's extended delay in filing a motion to dismiss after receiving an inadequate expert report did not result in a waiver of the right to file for dismissal. *Id.* at 157. The Burnses' reliance on that case is misplaced, though, because *Jernigan* did not concern attorney disqualification, a subject that the supreme court has determined requires a more exacting standard. *See Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding) ("[C]ourts must adhere to an exacting standard when considering motions to disqualify [counsel] so as to discourage their use as a dilatory trial tactic.").

"One of the requirements of that exacting standard is that a party who does not file a motion to disqualify opposing counsel in a timely manner waives the complaint." *In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 338 (Tex. 1999) (orig. proceeding) (Baker, J., concurring); *see Vaughan v. Walther*, 875 S.W.2d 690, 690 (Tex. 1994) (orig. proceeding) ("A party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint."). To determine waiver, the court considers "the length of time between when the conflict was apparent and when the motion was filed." *Zaffirini*, 419 S.W.3d at 514 (citing *Vaughan*, 875 S.W.2d at 690–91).

The supreme court in *Vaughan* found that a six-and-a-half-month delay resulted in waiver of the right to file a motion to disqualify. *Vaughan*, 875 S.W.2d at 690. This court has found waiver based on delays of seven months, *Zaffirini*, 419 S.W.3d at 515, and even three months, *Enstar Petroleum Co. v. Mancias*, 773 S.W.2d 662, 664 (Tex. App.—San Antonio 1989, orig. proceeding).

Alvin's motion to disqualify demonstrates that he was aware of Langley & Banack's possible conflict of interest immediately upon receiving Dimmit County's original answer in

August 2014. In his motion, Alvin expressed that he was shocked when Langley & Banack filed an answer on behalf of Dimmit County because that firm had previously represented Merle "in matters involving exactly the same issue" against Dimmit County. Despite this shock, Alvin waited over nine months to move for disqualification.

Alvin argues that his delay is excused because he was not aware of the *extent* of Langley & Banack's conflict of interest until he received certain discovery requests, and he moved for disqualification two months later. The starting point for assessing a party's delay is the point when *a* conflict of interest becomes apparent, not when the extent of that conflict is developed. *See Zaffirini*, 419 S.W.3d at 514. Indeed, the supreme court in *Vaughan* measured the period of delay from the date on which the complaining party became aware of the attorney's "*possible* conflict of interest." *Vaughan*, 875 S.W.2d at 690–91 (emphasis added).

Alvin's assertion that he was not aware of the identity of issues in the two representations is belied by his own testimony at the disqualification hearing. Alvin acknowledged that he was intimately involved with Langley & Banack's prior representation of Merle. He even confirmed that he personally discussed with firm attorneys both the claims to Townsite streets and alleys the Burnses were asserting at that time and future potential adverse possession claims. The trial court could infer from this testimony that it was immediately apparent to Alvin that the firm's prior representation of Merle and the present lawsuit against Dimmit County involved a conflict of interest.[7] Because of his involvement with the prior representation, Alvin admittedly knew what property rights were at issue there. And, because he initiated the current litigation, he knew what property rights are at issue here.

---

[7] We express no opinion concerning whether a conflict of interest, in fact, existed. The significant fact is that Alvin and Merle believed that there was a conflict of interest and, accordingly, had an obligation to act diligently on that belief by filing a motion to disqualify.

Alvin's own testimony demonstrates that he was aware of the asserted conflict of interest from the outset of this case, even before the suit was filed. Alvin testified that, approximately a week before he filed suit, he and his then-attorney appeared before the Dimmit County Commissioner's Court and told that court that it would be a conflict of interest for the county to hire Langley & Banack in this dispute. And, within weeks of receiving the answer Langley & Banack filed on Dimmit County's behalf, Alvin's attorney informed Langley & Banack that a conflict of interest existed. Yet no motion to disqualify was filed at that time.

Alvin insists that "[t]here can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Jernigan*, 111 S.W.3d at 156. Alvin recognized and openly asserted, both personally and through counsel, that a conflict of interest existed, yet failed to file a motion to disqualify for another nine months. In the meantime, the lawsuit progressed and Langley & Banack continued to participate on behalf of Dimmit County. Alvin's failure to assert his known right was inconsistent with an intent to rely upon that right and constitutes a waiver. *See id.*

The record fully supports the trial court's ruling that Alvin waived the right to seek Langley & Banack's disqualification. The court did not abuse its discretion by denying his amended motion to disqualify. *See Spears*, 797 S.W.2d at 656 (reviewing trial court's refusal to grant disqualification for abuse of discretion).

### *Merle's intervention and disqualification*

Merle argues that Alvin's nine-month delay in filing his motion to disqualify does not impact Merle's right to move for disqualification because he was not a party to the lawsuit at the time of the delay. *See Serna v. Webster*, 908 S.W.2d 487, 492 (Tex. App.—San Antonio 1995, no writ) ("To intervene, a party must file a written pleading."). This argument is disingenuous. Merle purported to join Alvin's amended motion to disqualify "by way of intervention." Nine months

later, Merle filed a plea in intervention. Merle never filed any additional or amended motion to disqualify. If, as Merle contends, Alvin's actions in relation to moving to disqualify Langley & Banack cannot be imputed to Merle prior to the time he became a party to the lawsuit, then Merle has never effectively sought disqualification. If, however, Merle's assertion of disqualification derives from Alvin's, then, as discussed above, the trial court did not abuse its discretion by denying Alvin's amended motion to disqualify Langley & Banack. *See Spears*, 797 S.W.2d at 656. We overrule Merle's issue as to attorney disqualification.

<u>*Easement appurtenant to the Rectangle*</u>

Alvin contends that the 1927 Deed from Catarina Townsite Company to Catarina Water Supply Company not only conveyed the Rectangle but also created an easement appurtenant to that land. The trial court agreed and declared that "an easement appurtenant exists as to the Rectangle which permits its fee simple owner the right to use Townsite streets and alleys but only as is reasonably necessary to install and/or access, maintain and repair water lines/pipelines beneath such streets and alleys as limited by the Specific Purpose." The court defined "Specific Purpose," according to the language of the 1927 Deed, as "the operation of a water works and/or irrigation system to serve Catarina Townsite and adjacent lands." The court specifically declared that "such Specific Purpose does not extend to supplying or delivering water to third parties for oil field fracking or oil well operations."

On appeal, Dimmit County asserts that the trial court erred by holding that an easement appurtenant exists; Alvin asserts that the court erred by limiting the scope of that easement. Resolving these issues requires examining the deeds in Alvin's chain of title to the Rectangle and, most particularly, the 1927 Deed. No party contends that any of these deeds are ambiguous.

Construction of an unambiguous deed is a question of law which is reviewed *de novo*. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). "In construing an unambiguous deed, our

primary duty is to ascertain the parties' intent as expressed by the words of their agreement." *Medina Interests, Ltd. v. Trial*, 469 S.W.3d 619, 622 (Tex. App.—San Antonio 2015, pet. denied) (citing *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). This basic rule of contract construction also applies to interpreting the terms of an express easement so that "[t]he contracting parties' intentions, as expressed in the grant, determine the scope of the conveyed interest." *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700–01 (Tex. 2002).

"An easement is a non-possessory interest in another's property that authorizes the holder to use that property for a particular purpose." *Seber v. Union Pac. R.R. Co*., 350 S.W.3d 640, 646 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Marcus Cable*, 90 S.W.3d at 700). "There are two types of easement: in gross and appurtenant. An easement appurtenant attaches to the land and passes with it, while an easement in gross is personal and attaches only to the grantee." *Long Island Owner's Ass'n, Inc. v. Davidson*, 965 S.W.2d 674, 684 (Tex. App.—Corpus Christi 1998, pet. denied); *see Killam Ranch Props., Ltd. v. Webb Cty*., 376 S.W.3d 146, 155 (Tex. App.—San Antonio 2012, pet. denied). Whether an easement is in gross or appurtenant is determined by interpreting the grant creating the easement. *McDaniel v. Calvert*, 875 S.W.2d 482, 484 (Tex. App.—Fort Worth 1994, no writ). Courts do not presume an easement to be in gross if it can fairly be construed to be appurtenant. *Id*.

An easement appurtenant requires a dominant estate, to which the easement is attached, and a servient estate, "which is subject to the use of the dominant estate to the extent of the easement granted or reserved." *Seber*, 350 S.W.3d at 646 (citing *Drye v. Eagle Rock Ranch, Inc*., 364 S.W.2d 196, 207 (Tex. 1962)). Because an express easement appurtenant is an interest in real property, it must be created in writing. *Drye*, 364 S.W.2d at 203. Alvin insists that he owns an express easement appurtenant; he makes no claim to any implied easement appurtenant.

We begin our analysis with the 1927 Deed, the writing on which Alvin relies as the source of his claimed easement appurtenant. That deed provides that Catarina Townsite Company

> does Grant, Sell and Convey unto Catarina Water Supply Company . . . [the Rectangle, as identified by its legal description] and *all easements, rights, licen[ses] and privileges owned or held by Catarina Townsite Company*, for the use of roadways and/or alleys situated in or near said Catarina Townsite, in Dimmit County, Texas, for the purposes of erecting, constructing, operating and repairing thereon and/or removing therefrom water mains and pipes, irrigation canals, flumes, pipes and/or ditches, and such other purposes as are incident, so far as the same are incident, to the operation of a water works and/or irrigation system to serve Catarina Townsite and adjacent lands; . . . .

(Emphasis added.)

Relying on the emphasized language, Dimmit County argues that the 1927 Deed conveyed only such easements, rights, licenses and privileges as were "owned or held by Catarina Townsite Company" at the time the deed was executed. To determine what Catarina Townsite Company owned or held at that time, we look to the 1925 Plat by which the Townsite was created and in which Catarina Townsite Company's easements, rights, licenses and privileges were defined.

The 1925 Plat contains the following language, which is broken into paragraphs for ease of reference:

> [1]   The public is hereby granted an easement for the use of the roadways and alleys shown on said plat or map, for ordinary, non-profit, highway purposes;
>
> [2]   provided, however, that no person (except CATARINA TOWNSITE COMPANY, its successors and assigns) shall ever have the right or privilege to use said roadways and/or alleys for any purpose for profit;
>
> [3]   provided, further, that CATARINA TOWNSITE COMPANY, for the sole use of itself, its successors and assigns, hereby expressly reserves and retains the exclusive right and privilege to use said roadways and/or alleys for the purpose of erecting, constructing, operating and repairing thereon and/or removing therefrom pipe lines, telephone and telegraph lines, electric light and power lines, water mains and pipes, railroads and railway lines, motor busses, sewer and drains, gas pipes and mains, irrigation canals and ditches and other such purposes as CATARINA TOWNSITE COMPANY, its successors and assigns, may desire;

- 13 -

[4]   the said CATARINA TOWNSITE COMPANY hereby expressly reserves and retains the right to assign, from time to time, and so often as it desires, any and/or all of said rights and privileges[;]

[5]   CATARINA TOWNSITE COMPANY reserves and retains the further right to, at any time and from time to time so often as it may desire, to close or abandon any street, road, alley or any part thereof upon obtaining the consent of the owner or owners, only, of lands fronting upon those parts of any such street, road, or alley which are so closed or abandoned.

The first paragraph grants to the public an easement to use the Townsite's roads and alleys for ordinary purposes. Paragraphs two through five then identify and reserve to Catarina Townsite Company certain rights and privileges, including the exclusive right and privilege to use the roads and alleys for for-profit purposes (some such uses being enumerated in paragraph three) and the right to close or abandon any street, road, or alley, in whole or in part, by obtaining consent of the owners of lands fronting upon the portion to be closed or abandoned.

No language in the 1925 Plat can fairly be construed as creating an easement appurtenant. *See McDaniel*, 875 S.W.2d at 484. First, there is no mention of any dominant estate.[8] *See Drye*, 364 S.W.2d at 207 (easement appurtenant requires a dominant estate). Second, use of Townsite roads and alleys for profit (including for such purposes as "erecting, constructing, operating and repairing thereon and/or removing therefrom pipe lines, . . . water mains and pipes, . . . irrigation canals and ditches") is explicitly identified as a "right or privilege" which Catarina Townsite Company specifically reserved "for the sole use of itself, its successors and assigns." *Cf. id.* (easement appurtenant attaches to land not person). Finally, Catarina Townsite Company reserved the right to assign its for-profit use rights or privileges whenever and as often as it desired. *Cf.*

---

[8] The absence of a dominant estate is highlighted by the fact that Catarina Townsite Company's purpose in subdividing its property was to sell the subdivided lots to third persons. Nothing in the 1925 Plat prevented it from selling all or any given part of the real property it owned in the Townsite yet retaining the rights it expressly reserved.

*Killam Ranch*, 376 S.W.3d at 155 (easement appurtenant passes with, and cannot be separated from, land).

By virtue of the 1925 Plat, Catarina Townsite Company owned a personal right or privilege to use Townsite roads and alleys for for-profit purposes. Thus, the 1925 Plat created an easement. *See Seber*, 350 S.W.3d at 646 ("An easement is a non-possessory interest in another's property that authorizes the holder to use that property for a particular purpose."). Owned by Catarina Townsite Company and not attaching to any particular parcel of land, the easement was in gross rather than appurtenant. *See Orange Cty., Inc. v. Citgo Pipeline Co*., 934 S.W.2d 472, 476 (Tex. App.—Beaumont 1996, writ denied) ("The easement in question is an easement in gross, as opposed to an easement appurtenant, because it is not created to benefit nor does it benefit the possessor of any tract of land in his use of it as such possessor.").

That the 1925 Plat created an easement in gross rather than an easement appurtenant is also demonstrated by the 1927 Deed. In that deed, Catarina Townsite Company conveyed its right to use Townsite roads and alleys only for one narrow purpose—operating a water works or irrigation system. It did not convey its right to use those roads and alleys for any other for-profit purpose, such as erecting power lines or operating a railroad. The fact that it carved out one limited aspect of its exclusive for-profit use rights supports the conclusion that Catarina Townsite Company's for-profit use of Townsite roads and alleys was a personal right and not an easement appurtenant to any Townsite property.

We note that the fact that Catarina Townsite Company transferred part of its easement does not mean that the easement was not in gross. While easements in gross are ordinarily not transferable, "the parties may create an assignable easement in gross through an express assignment provision." *Southtex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 546 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). That is precisely what Catarina Townsite Company

accomplished in paragraph four above. In addition, Texas law recognizes the transferability of a commercial easement in gross. *See Marcus Cable*, 90 S.W.3d at 700 (recognizing assignability of utility easement provided assigned use does not exceed originally granted use); *AIMCO Props., L.P. v. Time Warner Entm't-Advanced/Newhouse P'ship*, No. 03-97-00340-CV, 1997 WL 590675, at *3 (Tex. App.—Austin Sept. 25, 1997, no pet.) (acknowledging authority that commercial easements in gross are assignable and noting absence of Texas authority unequivocally holding they are not). Catarina Townsite Company's for-profit use easement was a commercial easement and, for this additional reason, was transferable. However, unlike an easement appurtenant, that easement would not transfer by deed without any mention of it. *Cf. Van De Putte v. Cameron Cty. Water Control & Improvement Dist. No. 7*, 35 S.W.2d 471, 473 (Tex. Civ. App.—San Antonio 1931, no writ) (easement appurtenant passes with land even without mention).

The plain language of the 1927 Deed clearly reflects that Catarina Townsite Company transferred to Catarina Water Supply Company only such easements, rights, licenses or privileges as already existed and were owned or held by Catarina Townsite Company at the time the deed was executed. Nothing in the 1927 Deed demonstrates an intent by the parties to create a new property interest, whether by easement or any other means. And, as just explained, what Catarina Townsite Company owned was a personal right or easement in gross to use Townsite roads and alleys for for-profit purposes, a portion of which is what was conveyed.

In arguing for an easement appurtenant, Alvin appears to rely solely on the fact that the 1927 Deed conveys the Rectangle, which he identifies as a dominant estate, and also conveys rights to use Townsite roads and alleys, which he identifies as a servient estate. The mere fact that a deed references two properties is insufficient to satisfy the requirement that an express easement appurtenant be created in writing. *See Drye*, 364 S.W.2d at 203. Further, even if we were to

construe the 1927 Deed as creating a new easement, it cannot fairly be construed as creating an easement appurtenant. *See McDaniel*, 875 S.W.2d at 484.

Again, an easement appurtenant "attaches to the land of the dominant estate and not merely for the convenience of the owner thereof independent of the use of his land." *Drye*, 364 S.W.2d at 207. And such an easement, by definition, is one that *benefits a specified parcel of land* regardless of who owns it. *Daniel v. Fox*, 917 S.W.2d 106, 110 (Tex. App.—San Antonio 1996, writ denied); *see Killam Ranch*, 376 S.W.3d at 155 (easement appurtenant benefits the property to which it is attached). Stated another way, an appurtenant benefit is the right to enjoy an easement "that can be held only by the owner or occupier of a particular unit or parcel" of land. *Killam Ranch*, 376 S.W.3d at 155 n.4. Use and enjoyment of the easement must therefore be connected to the land itself.

Nothing in the 1927 Deed suggests that the right it conveys to use Townsite roads and alleys to operate a water works or irrigation system is in any way for the benefit of the Rectangle, regardless of who owns it, rather than for the benefit of Catarina Water Supply Company. The deed does not refer to any water source or equipment located on the Rectangle,[9] nor does it indicate that use of Townsite roads and alleys for purposes incident to operating a water works or irrigation system must necessarily be tied to any such water source or equipment. The deed plainly grants the right to use Townsite roads and alleys for purposes incident to operating a water works or irrigation system without regard to whether any portion of that system is actually located on the Rectangle. In fact, Alvin testified that the Burnses used a well located on property other than the Rectangle as a back-up to operate their water system.

---

[9] The deed conveys certain physical equipment "now owned by Catarina Townsite Company and used in connection with a water works and/or irrigation system serving said Catarina Townsite and adjacent lands." The conveyance, however, does not indicate that any of this physical equipment is located on the Rectangle or that the Rectangle is in any way significant to operating the water works or irrigation system.

The Burnses state that an appurtenance is something that is "actually and directly necessary to the enjoyment of the property." *Quoting Balcar v. Lee Cty. Cotton Oil Co.*, 193 S.W. 1094, 1095 (Tex. Civ. App.—Austin 1917, no writ). They then argue that the right to use Townsite streets and alleys to operate a water system must be an appurtenant easement because "no community can survive without access to water." This implies, however, that use of Townsite streets and alleys for this purpose is "actually and directly necessary to the enjoyment of" Townsite property generally. This argument undercuts, rather than supports, the contention that the easement is appurtenant to the Rectangle.

The conclusion that the easement is in gross rather than appurtenant is not only dictated by the language of the 1927 Deed, it is supported by the Burnses' own actions. Alvin acknowledges that Merle, his predecessor-in-interest, previously "transferred some of his easement rights in Catarina's streets." If those easements were appurtenant to the Rectangle, Merle could not have transferred them without also conveying the Rectangle itself. *See Killam Ranch*, 376 S.W.3d at 155 (easement appurtenant cannot be separated from the land); *Van De Putte*, 35 S.W.2d at 473 (easement appurtenant cannot exist separate and apart from property to which it is appurtenant). In the 2011 Deed to Alvin, Merle again conveyed some of the easements but not the Rectangle. And, after correcting that deed to convey the Rectangle, Merle reserved certain easement rights, thus divorcing them from the Rectangle itself. Again, this would not be possible if the easements were appurtenant to the Rectangle. *See Killam Ranch*, 376 S.W.3d at 155; *Van De Putte*, 35 S.W.2d at 473. Thus, the Burnses' own conduct evidences their understanding, at least prior to this lawsuit, that any right they had or have in Townsite roads and alleys is not by virtue of an easement appurtenant to the Rectangle.[10]

---

[10] Merle asserts in his reply brief (which Alvin adopts by reference) that, while he "no longer owns the dirt located in the Rectangle, he still owns the right to use the easement appurtenant to the Rectangle." This contention is directly

We hold that the trial court erred by construing the 1927 Deed as creating an easement appurtenant to the Rectangle. The portion of the judgment declaring the existence of an easement appurtenant to the Rectangle is reversed and judgment is rendered declaring that no such easement appurtenant exists. Because of this holding, we need not address the Burnses' contentions that the trial court improperly restricted their rights under the alleged easement appurtenant.

*Exclusive right to use Townsite streets and alleys for profit*

The trial court declared that the Burnses "do not own, hold, or possess any special or exclusive easement rights, including ones for profit, to use or enjoy the Townsite streets and alleys as successor to anyone, including Catarina Townsite Company." The Burnses assert that, as successors-in-interest to Catarina Townsite Company, they possess an exclusive right to use Townsite streets and alleys for profit and, particularly, to operate a water works to serve the Townsite and adjacent lands.

Because no easement appurtenant to the Rectangle was created by the 1927 Deed, any right the Burnses may have acquired to use Townsite roads and alleys must have been expressly conveyed to them. *Cf. Van De Putte*, 35 S.W.2d at 473 (easement appurtenant passes with land even without mention). A review of the deeds in their chain of title to the Rectangle, however, reveals that Merle and Alvin do not possess any easement right (much less an exclusive right) to use Townsite roads and alleys to operate a water works or for any other purpose.

In 1945, Catarina Water Supply Company conveyed the Rectangle to Natalia Vineyards, Inc. This deed includes a conveyance of "all easements, rights, licenses and privileges owned or held by Catarina Water Supply Company" for the use of Townsite roads and alleys for the same

---

contrary to Texas law that an easement appurtenant is attached to the land. *See Drye*, 364 S.W.2d at 203. Merle's contention that he retains the right to use an alleged easement despite his lack of any ownership in the Rectangle is essentially a concession that the easement is not appurtenant.

purposes as are delineated in the 1927 Deed. It also conveyed physical equipment "used in connection with or incident to the operation of a water works and irrigation system serving said 'Catarina Townsite' and adjacent lands." This deed effectively conveyed Catarina Water Supply Company's easement in gross.

In 1946, Natalia Vineyards conveyed the Rectangle to J. Stuart Pearce, along with "all easements, rights, license and privileges thereto appurtenant or belonging for the use of roadways and/or alleys" in the Townsite. This deed contains the same language as the 1945 deed concerning operation of a water works and/or irrigation system and conveyance of physical equipment. This deed also effectively conveyed the easement in gross.

Later in 1946, Pearce conveyed to Regina Ladd and others (collectively "Ladd") a reduced version of the Rectangle. In addition, that deed conveyed "all appurtenances thereto belonging" and physical equipment used in connection with a well located on the Rectangle. Unlike the prior deeds, this deed does not contain any language concerning use of Townsite roads and alleys. It also does not contain the broad language of prior deeds concerning "operation of a water works and irrigation system serving said 'Catarina Townsite' and adjacent lands." This deed cannot be construed as conveying the easement in gross as it makes no mention of the location of that easement (Townsite streets and alleys) or the purpose for the easement (operating a water works or irrigation system to serve the Townsite and adjacent property).

In 1960, Ladd conveyed the reduced Rectangle to Merle. This deed, like the 1946 deed to Ladd, states that Ladd is conveying "all appurtenances thereto belonging" and physical equipment used in connection with a well on the Rectangle; it, however, makes no mention of any rights to use Townsite roads and alleys or operating a water works and irrigation system to serve the Townsite and adjacent lands. This deed does not convey the easement in gross for the reasons stated above, and because Ladd never had that easement to convey.

In 2011, Merle conveyed to Alvin "all of [Merle's] Rights and Title as a successor of the Catarina Townsite Company to the roadway and alleyway easements in the Catarina Townsite . . . ." Merle reserved the right to use the water line easements "for the purpose of transporting water for [his] personal, commercial, and agricultural use." This deed does not convey, identify, or even mention the Rectangle. It purports to convey the easement in gross once owned by Catarina Townsite Company; however, like Ladd, Merle could not convey that easement because he never owned it.

In 2014, Merle and Alvin executed a correction deed, replacing the language quoted above with language conveying the Rectangle "together with all appurtenances thereto belonging" and physical equipment "now used in connection with [the] well located on [the Rectangle]." The deed, as corrected, does not contain an express conveyance of any easements. It does, however, state as an exception from the conveyance certain easements conveyed by Merle to CWSC in 1996. The deed to Alvin was again corrected in 2015 to append an exhibit that was referenced in, but omitted from, the 2011 correction deed. As with that previous deed, the 2015 correction deed does not contain any language expressly conveying to Alvin any road or alley easements. In any event, Merle did not have the easement in gross to convey.

Our review of the deeds in the Burnses' chain of title to the Rectangle reveals that no easement, right, license or privilege to use Townsite streets and alleys to operate a water works or irrigation system was conveyed after the 1946 conveyance of the Rectangle from Natalia Vineyards to Pearce. Pearce's subsequent conveyance to Ladd not only reduced the acreage of the Rectangle, it reduced the rights conveyed. While specifically describing and conveying the reduced Rectangle and physical equipment used in connection with a well located on that property, it makes no mention at all of any easement, right or privilege to use Townsite streets and alleys for operating a water works or for any other purpose. Further, because we have held above that the

easement created in 1927 to use Townsite streets and alleys is an easement in gross rather than appurtenant, that easement is not encompassed within the deed language conveying "all appurtenances thereto belonging" to the Rectangle.

Since Ladd did not receive the easement in gross, he could not have conveyed it to Merle, who could not have conveyed it to Alvin. The trial court correctly held that neither Alvin nor Merle "own, hold, or possess any special or exclusive easement rights, including ones for profit, to use or enjoy the Townsite streets and alleys as successor to anyone, including Catarina Townsite Company." That portion of the judgment is affirmed.

*Right to close Townsite streets and alleys*

The trial court declared that the public has "the unfettered right to use and enjoy Townsite streets and alleys for all purposes including ingress and egress," and ordered that Merle and Alvin "shall not interfere with the use and enjoyment of the Townsite streets and alleys by the public." The Burnses assert that this declaration and order are in error because they possess the right to close or abandon Townsite streets and alleys as successors-in-interest to Catarina Townsite Company. For the reasons discussed above and others below, the Burnses' chain of title reveals that they did not acquire any such rights.

The 1925 Plat reserves to Catarina Townsite Company the right "to close or abandon any street, road, alley or any part thereof upon obtaining the consent of the owner or owners, only, of lands fronting upon those parts of any such street, road, or alley which are so closed or abandoned." This right is identified and reserved in the 1925 Plat separately from the right to use Townsite streets and alleys for for-profit purposes. Further, it is only this latter right to *use* the streets and alleys that was conveyed in the 1927 Deed (and then only to the extent of operating a water works or irrigation system). There is no mention of the separate right to *close or abandon* streets and alleys. Because the right to close or abandon streets and alleys was not included in the 1927 Deed,

such right could not have been conveyed by any subsequent deed in Merle's and Alvin's chain of title to the Rectangle.

In addition, no one could possess any right in derogation of the public's right to use the Townsite streets and alleys once they were dedicated to the public. *See State v. NICO-WF1, L.L.C.*, 384 S.W.3d 818, 822 (Tex. 2012) (holding that "most if not all" of dedicator's reservation to use streets to construct ditches, pipelines, line of poles and wires, and to excavate and grade streets, among other reservations, were inconsistent with the dedication to the public). "When a dedication includes a condition that is inconsistent with the grant or contravenes public policy, the dedication is nevertheless effective even though the condition is not." *Id.*

The trial court in this case determined that the Townsite streets and alleys "were and are dedicated to the public." No party contests that ruling on appeal. The dedication to the public effectively negated any claimed right by Catarina Townsite Company or any of its successors-in-interest that is repugnant to the dedication or against public policy. *See id.* at 822–23. The right to close or abandon Townsite streets and alleys is certainly repugnant to the dedication and against public policy because it would enable a private party to wholly deprive the public of the use and enjoyment of those streets and alleys. For this additional reason, the Burnses did not acquire, and do not possess, any right to close or abandon Townsite streets and alleys.

We affirm the portion of the judgment that declares the public has "the unfettered right to use and enjoy Townsite streets and alleys for all purposes including ingress and egress," and orders that Merle and Alvin "shall not interfere with the use and enjoyment of the Townsite streets and alleys by the public."

*Right to use existing water lines*

In 1996 and 2004, Merle deeded to CWSC certain pipeline easements running along, and adjacent to, specified Townsite streets and alleys. The trial court and the parties refer to these as the "Pipeline Easement Transfers."[11] Both conveyances contain the following reservation:

> [Merle] hereby reserves the right to use the existing water lines situated in the easements hereby conveyed for the purpose of transporting water for [Merle's] personal use; however, [Merle] shall not use the existing pipeline to provide water for public use[,] such use shall be limited to [Merle's] personal use and use for agricultural purposes.

As we have held above, Merle did not own any easement rights in Townsite streets and alleys. For this reason, what, if anything, was accomplished by these conveyances to CWSC is unclear. We need not address this matter, though, as no party challenges these purported easement transfers.[12] Dimmit County does, however, challenge the trial court's combined finding of fact and conclusion of law that Merle retained a right to use the existing water lines for his personal use.

Merle asserts that his claim to the existing water lines arises from the 1960 deed from Ladd under which he acquired the Rectangle and physical equipment used in connection with a well on that property. As no party has argued to the contrary, we assume that this physical equipment includes the existing water lines here at issue.

Dimmit County contends that the existing water lines, having been buried for decades, are fixtures rather than personal property. It urges that Merle therefore has no ownership of those water lines because he does not own (and makes no claim to own) the land under which those water lines are buried. Merle responds that this argument is waived because Dimmit County never raised it in the court below. Dimmit County does not identify anything in the record showing that it brought

---

[11] In 2012, CWSC transferred all of its rights, title, and interest under the Pipeline Easement Transfers to Dimmit County.

[12] We note that Merle operated a water system for many years, apparently without objection from anyone, using pipes and other equipment under or adjacent to Townsite streets and alleys.

its fixture argument to the attention of the trial court. In fact, counsel for Dimmit County affirmatively joined the statement of counsel for another party that Merle owned the pipes as personal property and that he could "dig them up and take them away." Dimmit County's assertion that Merle does not own the existing water lines because they are fixtures is waived.

The question remains, however, whether Merle has any right to *use* the existing water lines for his own personal use. We reiterate that Merle did not acquire any easement or right to use Townsite streets and alleys. Even so, we will address the issue on the assumption that Merle is asserting a right to use the existing water lines that is somehow distinct from a right to use Townsite streets and alleys—that is, that Merle may use the water lines in place provided his use does not disturb or interfere with Townsite streets and alleys.

The Burnses state in their response to Dimmit County's brief that "their interest is in the pipes themselves and in an easement right to keep those pipes in place and to use them *for purposes permitted under the relevant deeds*." (Emphasis added.) We thus turn again to the deeds in the Burnses' chain of title to the Rectangle, and find that we need look no further than the 1927 Deed to Catarina Water Supply Company.

The only entitlement to use Townsite streets and alleys conveyed under the 1927 Deed was limited to a specific *public* purpose:

> all easements, rights, licen[ses] and privileges owned or held by Catarina Townsite Company, for the use of roadways and/or alleys situated in or near said Catarina Townsite, in Dimmit County, Texas, for the purposes of erecting, constructing, operating and repairing thereon and/or removing therefrom water mains and pipes, irrigation canals, flumes, pipes and/or ditches, and such other purposes *as are incident, so far as the same are incident, to the operation of a water works and/or irrigation system to serve Catarina Townsite and adjacent lands*; . . . .

(Emphasis added.) Even if Merle had acquired easement rights, his exercise of them would be limited to the specifically stated public purpose. *See Marcus Cable*, 90 S.W.3d at 700 (easement use is limited to particular purpose; use by transferee cannot exceed use originally granted).

Merle argues that personal use is not excluded because the deed does not use the word "public." Even so, the explicitly stated purpose is "to serve Catarina Townsite and adjacent lands." This is clearly a public purpose and does not encompass personal use.

Merle next argues that his sale of water to oilfield operators falls within the purposes defined by the 1927 Deed. He also insists that providing water to oilfield operators is a personal, not public, purpose. We need not determine whether this use is personal or public.[13] If it is a public use, Merle did not reserve it in his conveyance to CWSC. If it is a personal use, Merle could not have reserved it because he never owned it; personal use was never granted to him in the relevant deeds. In either event, Merle has no right to use the existing water lines to provide water to oilfield operators.

The trial court correctly held that Merle has no right to use the existing water lines to provide water to oilfield operators. It erred, however, by holding that Merle retained the right to use those water lines for his own personal and agricultural purposes. Because Merle did not effectively reserve any rights to use the existing water lines, we do not address his complaint that the trial court improperly limited his reserved rights.

The portion of the judgment declaring that Merle retained any right to use the existing water lines is reversed. Judgment is rendered that Merle does not own or possess any right to use the existing water lines.

*Ownership of existing water lines*

In a related issue, Merle contends that the trial court erred by finding that, through the Pipeline Easement Transfers, he conveyed to CWSC ownership of the water lines and pipelines

---

[13] We note that public versus personal is a false dichotomy. A use that is not public is not necessarily personal. A commercial use is neither public nor personal. Notably, Merle himself acknowledged the distinction in the 2011 Deed to Alvin, in which Merle reserved rights to use water easements for personal, commercial, and agricultural use.

contained in the transferred easements. As just discussed, by the 1960 deed from Ladd to Merle, Merle acquired certain physical equipment used in connection with a well located on the Rectangle. We agree with Merle that the 1996 and 2004 deeds effecting the Pipeline Easement Transfers conveyed only "certain pipeline easements." No language in those deeds conveys ownership of any physical equipment, including water lines and pipelines.

The trial court erred in finding that Merle transferred ownership of the existing physical water lines to CWSC. The judgment is modified to omit this finding.

_Abandonment and adverse possession of San Mateo_

The trial court found that a Townsite street named San Mateo was dedicated to the public and has not been abandoned, except for one specified section which is not at issue here. The court further found that the Burnses do not own any part of that street under any of the theories they alleged. The Burnses challenge the legal and factual sufficiency of the evidence to support the findings on abandonment and ownership.

A trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence under the same standards that apply to a review of the legal and factual sufficiency of the evidence supporting a jury's finding. _Anderson v. City of Seven Points_, 806 S.W.2d 791, 794 (Tex. 1991). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." _City of Keller v. Wilson_, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, the reviewing court must credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. _See id._; _Guardianship of Tischler_, 505 S.W.3d 73, 76 (Tex. App.—San Antonio 2016, no pet.). "If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails." _Tischler_, 505 S.W.3d at 76 (citing _BMC Software Belgium, N.V. v. Marchand_, 83 S.W.3d 789, 795 (Tex. 2002)).

"When a party attacks the factual sufficiency of an adverse finding on an issue on which [he] has the burden of proof, [he] must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). The reviewing court must consider all of the evidence, and can set aside a judgment "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

The Burnses contend that San Mateo was abandoned pursuant to section 251.057 of the Texas Transportation Code ("Section 251.057"). That statute provides:

> A county road is abandoned when its use has become so infrequent that one or more adjoining property owners have enclosed the road with a fence continuously for at least 20 years. The abandoned road may be reestablished as a public road only in the manner provided for establishing a new road.

TEX. TRANSP. CODE ANN. § 251.057(a).

"Enclosed the road with a fence" indicates that access to the road is barred, not simply made inconvenient. The mere "existence of a gate across the road does not necessarily indicate that the road is not a public road." *Payne v. Doty*, No. 11-10-00181-CV, 2011 WL 6260370, at *3 n.3 (Tex. App.—Eastland Dec. 15, 2011, no pet.) (mem. op.) (holding gated road not statutorily abandoned). A locked gate, however, may establish a "fence" within the meaning of the statute if it is in place for the requisite period of time. *See Grand Lake Gathering Sys., Inc. v. Gray*, 441 S.W.2d 633, 635 (Tex. Civ. App.—Beaumont 1969, no writ) (finding statutory abandonment where traveling public could not use road because of locked gates).

San Mateo runs between property owned by the Burnses and property owned by Hope Balderas, Juan Morales Balderas, and Lucia Balderas Lopez ("Balderases"). The Balderas property was previously owned by the Steinhauer family. Andres Barnes Steinhauer testified that, while the main entrance to the property was from Highway 83, the family also accessed the property from

San Mateo. This "back way" was used for deliveries and larger vehicles, but was also used by family members. In addition, the water meter for the property was (and is) located on San Mateo.

Steinhauer testified that, after his father died, his elderly mother lived on the property alone. Steinhauer was concerned about her security because they had had problems with hunters using San Mateo. Sometime in the 1960's, he installed two posts and a chain across San Mateo as a "temporary barrier" to deter "*unnecessary* traffic." (Emphasis added.) Steinhauer also described this purpose as "to keep *too much* traffic from going through there." (Emphasis added.) The trial court could fairly infer from this testimony that the chain reduced, but did not stop, the flow of traffic.

While Steinhauer was uncertain whether the chain ever had a lock on it, he testified that people accessing his property from San Mateo would "stop there and take the chain down." He also testified that utility trucks could access San Mateo without needing a key. Alvin, on the other hand, testified that the chain across San Mateo prevented the general public from using the street. Based on this testimony, the Burnses argue that San Mateo has been "enclosed with a fence" since the 1960's.

As the factfinder in a bench trial, "the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Tischler*, 505 S.W.3d at 76 (citing *City of Keller*, 168 S.W.3d at 819). The trial court was entitled to give weight to Steinhauer's testimony rather than Alvin's concerning whether San Mateo was enclosed with a fence (*i.e.*, barred by a locked impediment) in the 1960's. *See id.* In this regard, we note that, while Steinhauer was an adult in the 1960's, Alvin was not even born until 1961.

Steinhauer's testimony, being more than a scintilla of evidence, is legally sufficient to support the implied finding that San Mateo was not enclosed with a fence in the 1960's. *See Tischler*, 505 S.W.3d at 76. Alvin's testimony to the contrary does not render that finding so

against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem.*, 46 S.W.3d at 242.

The Burnses next contend that, even if San Mateo was not enclosed with a fence in the 1960's, it was so enclosed in the 1980's when they replaced the Steinhauer's chain with a gate. Alvin testified that this gate was put up in the early 1980's; one of the men who helped put it up testified that it was in the mid-1980's. Alvin testified that he installed the gate to deter poachers, drug smugglers, and illegal aliens from using San Mateo. Having the gate in place also allowed him to use San Mateo as a holding pen when he wanted to transfer his cattle to the other side of Highway 83. Alvin insisted that the gate had a lock from the time it was erected.

The Balderases purchased the Steinhauer property in 2003. Hope Balderas testified that her family used San Mateo to access the property when it was rainy or muddy, and sometimes just because it was easier than using the Highway 83 access. She also testified that there was never a lock on the San Mateo gate.

The trial court was again faced with conflicting evidence. The Burnses concede that the testimony concerning when the gate was installed varies. The trial court was entitled to accept the testimony that it was installed in the mid-1980's. To establish statutory abandonment, it was the Burnses' burden to prove that San Mateo remained fenced off continuously for twenty years. TEX. TRANSP. CODE ANN. § 251.057(a). Thus, it was their burden to prove that the gate remained in place and equipped with a lock to prevent access from the mid-1980's until at least the mid-2000's. Hope Balderas testified that she and her siblings purchased the Steinhauer property in 2003 and that the San Mateo gate was never locked. Accepting this testimony, as the trial court was entitled

to do, establishes that San Mateo was not enclosed with a fence for a continuous period of twenty years.[14]

The evidence is legally and factually sufficient to support the trial court's finding that San Mateo was not abandoned. This holding also disposes of the Burnses' adverse possession claim.

"A person may not acquire through adverse possession any right or title to real property dedicated to public use." TEX. CIV. PRAC. & REM. CODE ANN. § 16.030(b). The Burnses acknowledge that a finding that San Mateo was abandoned is a prerequisite to their claim that they acquired ownership of San Mateo by adverse possession. Because we uphold the trial court's ruling that San Mateo was not abandoned, we also uphold its ruling that the Burnses do not own that street. Those portions of the judgment are affirmed.

*Statutory abandonment of other Townsite streets and alleys*

The trial court declared that certain Townsite streets and alleys (other than San Mateo) were abandoned pursuant to Section 251.057. It further ordered that fee simple title to those abandoned streets and alleys reverts to the owners of the adjoining property, with each owner owning fee simple title to the middle of the street or alley. In its findings of fact and conclusions of law, the court found that those streets and alleys had been enclosed by fences for over twenty years, were not reasonably necessary to reach adjoining real property, and did not lead to a cemetery. It therefore concluded that all requirements of Section 251.057 were met.

Dimmit County challenges the legal and factual sufficiency of the evidence to support the findings that the streets and alleys were not reasonably necessary to reach adjoining property and did not lead to a cemetery. It also asserts that the court's conclusion that the streets and alleys were statutorily abandoned is erroneous as a matter of law. Before we reach these issues, we must

---

[14] The Burnses state in their brief that the trial court could have construed "mid-1980's" to be as late as 1989, in which case the gate would have to have remained locked until 2009 to fulfill the 20-year statutory requirement.

address Dimmit County's threshold complaint that the trial court abused its discretion by permitting the Burnses to amend their pleadings after the close of evidence to assert these statutory abandonment claims at all.

*Trial amendment to allege statutory abandonment*

The Burnses' Sixth Amended Petition, which was their live pleading at the time of the trial on property issues,[15] alleged statutory abandonment only as to San Mateo. During trial, Dimmit County and other parties repeatedly objected to evidence concerning streets and alleys other than San Mateo on the ground that the abandonment claim in the pleadings concerned only San Mateo. They also repeatedly insisted that the issue would not be tried by consent. The trial court acknowledged that there would be no trial by consent, yet admitted the evidence with the assurance that it would review the scope of the pleadings.

Trial of the property issues concluded on February 27, 2015, at which time the trial court stated that the "[e]vidence and pleadings are closed" on those issues, and the parties presented their closing arguments.

On May 9, 2015, the trial court sent counsel for each of the parties an email stating its rulings on the property issues. In that email, the court stated its belief that certain streets and alleys, other than San Mateo, had been abandoned. The court explained,

> there are areas owned by Burns that have been under fence for many years and which have become overgrown by bushes and trees; in these areas a person walking the property would not see any streets and alleys, although they show up on the plat from the 1920s. On such areas, I will hold that these now-hidden streets and alleys have been abandoned.

Four months later (and seven months after the close of evidence), on September 8, 2015, the Burnses sought leave to file a Seventh Amended Petition, which expanded their statutory

---

[15] The court conducted the trial of this case in segments. The first phase of the trial addressed issues of property rights. Damage claims and attorney's fees were addressed in later proceedings.

abandonment claim to additional streets and alleys, so that their pleadings would conform to the court's rulings.

At an October 27, 2015 hearing, the trial court granted the Burnses leave to file the amended petition over objections by Dimmit County and other parties.[16] The court stated that it would allow the parties time to go out to the properties and "take pictures, and what have you" to demonstrate that the streets and alleys had not been under fence or whether it could be ascertained by the naked eye that there was a street there.

Rule 66 of the Texas Rules of Civil Procedure provides for amendment of pleadings during trial:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleading, . . . the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits. The court may grant a postponement to enable the objecting party to meet such evidence.

TEX. R. CIV. P. 66.

A court's decision to permit or deny a trial amendment is reviewed for abuse of discretion. *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994). It is not an abuse of discretion to permit a trial amendment merely because the amended pleading alleges a new cause of action. *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 65 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *Kilpatrick*, 874 S.W.2d at 658). Rather, the reviewing court must determine, in the context of the entire case, whether "(1) the amendment asserts a new substantive matter that reshapes the nature of the trial itself; (2) the new matter is of such a nature that the

---

[16] The court also granted leave to file an Eighth Amended Petition. Dimmit County objected to that amendment but does not challenge the court's ruling on appeal. The Eighth Amended Petition includes the statutory abandonment claims added in the Seventh Amended Petition.

opposing party could not have anticipated it in light of the development of the case up to the time the amendment was requested; and (3) the opposing party's presentation of its case would be detrimentally affected by the amendment." *Zarate v. Rodriguez*, 542 S.W.3d 26, 37 (Tex. App.— Houston [14th Dist.] 2017, pet. denied); *see Tanglewood*, 436 S.W.3d at 6465. We need address only the third element.[17]

Upon granting the trial amendment, the trial court *sua sponte* gave the parties time to examine the allegedly abandoned streets and alleys and to gather evidence to demonstrate that they had not been under fence for the requisite period of time. Four months later, on February 26, 2016, the court conducted another hearing, at which the parties engaged in a lengthy discussion of how to create a map to show which streets and alleys the court ruled were abandoned. The record of this hearing shows that the parties, including Dimmit County, had physically examined at least some of the properties, had engaged in negotiations concerning which of them had been under fence for the requisite period of time, and had come to an agreement on most of the streets.

While Dimmit County stated during this hearing that it was not waiving its objection to the trial amendment, it did not request that the court reopen the evidence on the abandonment issue, nor did it argue that it needed additional time to collect evidence on that issue. After extended input from the parties, the court clarified that its ruling on abandonment and its ruling on the permissible scope of the trial amendment were limited to the streets the parties agreed were abandoned. Those streets were delineated on a map marked as Defendant's Exhibit 204, which is appended to the final judgment.

---

[17] We note, however, that the Burnses' claim that streets and alleys other than San Mateo were statutorily abandoned was not wholly unanticipated. The Burnses' live pleadings, before the disputed amendment, contained factual allegations of streets and alleys being under fence for the requisite statutory period. *See* TEX. TRANSP. CODE ANN. § 251.057(a) (street must be continuously fenced for 20 years). In addition, Dimmit County, both in its pleadings and orally, through counsel, at the start of the trial, stated that it was not making any claim to streets and alleys the Burnses had under fence for that period.

At no time during this hearing did Dimmit County contend that the streets the court ultimately declared abandoned were not, in fact, abandoned. It also did not contest the court's understanding that the parties had reached an agreement identifying abandoned streets and alleys. In fact, Dimmit County affirmatively declined to object to the court's substantive ruling:

> THE COURT: Okay. Okay. I've heard enough on that. On the western side of this exhibit, Defendant's Exhibit 204, *anybody have a problem with the dark blue line, those streets being held to be abandoned under 251.057* because they have been fenced in and they have been overgrown for more than 20 years?
>
> MR. GONZALEZ: No objection from the county.

(Emphasis added.) The court then reiterated that only what was identified by the dark blue line on Defendant's Exhibit 204 was being declared to be abandoned, again with no opposition from Dimmit County.

The record thus reveals that, despite the late filing of the Burnses' trial amendment, Dimmit County had ample opportunity to develop and present a defense to the new abandonment claims. It did not, however, take advantage of that opportunity. Instead, it agreed to the court's ultimate ruling on the merits of those claims. In these circumstances, we cannot say that Dimmit County's presentation of its case was detrimentally affected by the trial amendment. *See Zarate*, 542 S.W.3d at 37; *Tanglewood*, 436 S.W.3d at 65. For this reason, the trial court did not abuse its discretion by granting leave to file the Burnses' Seventh Amended Petition.

### *Merits of statutory abandonment claims*

As previously noted, Section 251.057(a) provides that a county road is abandoned "when its use has become so infrequent that one or more adjoining property owners have enclosed the road with a fence continuously for at least 20 years." TEX. TRANSP. CODE ANN. § 251.057(a). The statute also provides that subsection (a) does not apply to:

> (1) a road to a cemetery, unless a property owner whose property adjoins the road enclosed with a fence under Subsection (a) files notice with the county clerk of the

county in which the road is located that the owner agrees to provide reasonable access to the cemetery in accordance with Section 711.041, Health and Safety Code; or

(2) an access road that is reasonably necessary to reach adjoining real property.

*Id.* at § 251.057(b).

Dimmit County contends that a claimant relying on subsection (a) to establish abandonment of a county road must negate the elements of subsection (b). It further contends that the evidence is legally and factually insufficient to support the trial court's findings that the streets and alleys it declared to be abandoned did not lead to a cemetery and were not reasonably necessary to reach adjoining real property. The Burnses respond that the elements of subsection (b) are an affirmative defense to the application of subsection (a).[18]

There is a dearth of authority addressing Section 251.057, and none that directly address the issue raised here. Two courts of appeals have treated subsection (b) as a matter to be proved by the party asserting abandonment. In *Chappell Hill Bank v. Smith*, 257 S.W.3d 320 (Tex. App.—Houston [14th Dist.] 2008, no pet.), the court held that "the criteria for statutory abandonment are satisfied" because the party seeking abandonment "presented evidence that the alley (1) has been partially enclosed by fence for at least 20 years; (2) is not a road to a cemetery; and (3) is not an access road that is reasonably necessary to reach adjoining property." *Id.* at 329, 330.

Similarly, in *Steel v. Wheeler*, 993 S.W.2d 376, 380 (Tex. App.—Tyler 1999, pet. denied), the court held that "[b]efore statutory abandonment could become applicable to the facts of this case, the [party seeking abandonment] had to show that the Upper Centralia Road was not reasonably necessary to reach adjoining real property." *Id.* at 380.

---

[18] While Dimmit County agreed to the court's identification of streets that had been fenced in for over twenty years (*i.e.*, the requirements of subsection (a) were met), the record does not show that it agreed that the requirements of subsection (b) were met. Neither the court nor any party mentioned subsection (b) during that hearing.

On the other hand, a case from this court may be read as imposing a burden on the party opposing a finding of abandonment to prove the elements of subsection (b). *See Rice v. Kuhn*, No. 04-03-00088-CV, 2005 WL 418202, at *3 n.3 (Tex. App.—San Antonio Feb. 23, 2005, pet. denied) (mem. op.). The court in *Rice* recognized in a footnote that the party opposing statutory abandonment argued that "the exception for 'an access road that is reasonably necessary to reach adjoining real property'" applied. *Id.* The court rejected this contention because there was no evidence to establish that the subject road was an "access road" or that it was "reasonably necessary to reach adjoining real property." *Id.*

None of these cases directly address the issue of which party bears the burden of proof on subsection (b). The Burnses cite, by analogy, the supreme court's opinion in *Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672 (Tex. 1990). Even though it addresses a different statute, we find *Eckman* to be instructive.

*Eckman* concerned the following definition of "consumer" under the Texas Deceptive Trade Practices Act ("DTPA"):

> ["Consumer" means] an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, *except* that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.

*Id.* at 674 (emphasis in original) (quoting TEX. BUS. & COM. CODE ANN. § 17.45(4)). The court held that the $25 million exception is an affirmative defense to be pleaded and proved by the defendant rather than an element to be proved by the plaintiff. *Id.* at 674–75.

In reaching this conclusion, the court instructed that "[t]he comparative likelihood that a certain situation may occur in a reasonable percentage of cases should be considered when determining whether a fact should be allocated as an element of the plaintiff's case or to the defendant as an affirmative defense." *Id.* at 675. Based on its assessment that "obviously" most

litigants do not have $250,000,000 in assets, the court placed the burden of pleading and proof on the defendant as a matter of judicial economy and efficiency. *Id.*

Unlike the DTPA provision at issue in *Eckman*, Section 251.057 does not use the term "except." The phrase it does use—"does not apply"—leads to the same result. A county road is abandoned if its use has become so infrequent that an adjoining property owner has enclosed it with a fence continuously for at least twenty years, *except* if the road leads to a cemetery or is reasonably necessary to reach adjoining real property. We find this aspect of Section 251.057 to be sufficiently akin to the statute at issue in *Eckman* to warrant applying the analysis set out in that case. Thus, we consider the comparative likelihood that the situations identified in subsection (b) may occur in a reasonable percentage of cases.

The supreme court considered it "obvious" that most consumers do not have $250 million in assets. While perhaps a closer call, we believe it is reasonable to conclude that most county roads do not lead to a cemetery. We believe it is also reasonable to conclude that most county roads that have been enclosed with a fence for at least twenty years are not reasonably necessary to reach adjoining real property. Because neither situation identified in subsection (b) is likely to occur in a reasonable percentage of abandonment cases, we hold that the party opposing statutory abandonment under subsection (a) bears the burden to plead and prove one or both elements of subsection (b). *See Eckman*, 784 S.W.2d at 675.

The Burnses had no burden to prove either that the abandoned streets and alleys do not lead to a cemetery or that they are not reasonably necessary to reach adjoining real property. Dimmit County's assertion that the Burnses did not present legally or factually sufficient evidence to prove those points therefore fails. Because Dimmit County did not plead or prove the elements of subsection (b), the trial court should not have included them in its findings of fact and conclusions of law. The finding that the abandoned streets and alleys "are not reasonably necessary to reach

adjoining real property and do not lead to a cemetery" does not, however, affect the judgment and may be disregarded as immaterial. *See Andrews v. Key*, 13 S.W. 640, 641 (Tex. 1890) (immaterial finding of fact is harmless).

That portion of the judgment declaring additional streets and alleys, as identified on Exhibit D to the judgment, to be statutorily abandoned is affirmed.

*Specificity of judgment terms*

The judgment contains the following orders:

> Dimmit County . . . can impose restrictions on the public and third party use of Townsite streets and alleys as is normal for any governmental entity, as well as preventing anyone, including Alvin and Merle, from interfering in any manner whatsoever with use by the public . . . of the Townsite streets and alleys, including attempts by anyone to lay pipelines, control, erect fences, block, or modify, and excavate in, across, on, or under any of the Townsite streets and alleys.

> Alvin and Merle . . . may not modify, obstruct, block off, dig or excavate in, or interfere with any of the Townsite streets and alleys without first obtaining the express written consent of . . . Dimmit County . . . .

Merle maintains that these provisions are too vague to be enforced because the judgment does not define "Townsite streets and alleys." *See Ex parte Slavin*, 412 S.W.2d 43, 44–45 (Tex. 1967) (decree must clearly inform party of duties or obligations it imposes). Merle notes that the trial court found certain Townsite streets and alleys to have been abandoned and declared that fee simple title to those streets and alleys "reverts to the lot or tract owners adjoining the specific street and alley." He argues that the provisions quoted above can reasonably be construed to include the abandoned streets and alleys, which are now private property. We disagree.

"Townsite streets and alleys" has been consistently used by the parties and the trial court throughout this litigation to refer to those streets and alleys identified in the 1925 Plat and later dedicated to the public. "Townsite" means "[a] portion of the public domain segregated by proper authority and procedure as the site for a town." *Townsite,* BLACK'S LAW DICTIONARY (10th ed.

2014). And "public domain" means "government-owned land." *Public Domain,* BLACK'S LAW DICTIONARY (10th ed. 2014) Applying these definitions, "Townsite streets and alleys" clearly encompasses only public streets and alleys.

The trial court declared that certain once-public streets and alleys were abandoned and that fee simple title to those abandoned streets and alleys reverts to the adjoining landowners. As a consequence, those streets and alleys are no longer public or "Townsite" streets and alleys; they are private streets and alleys (or, in some cases, no longer streets and alleys at all). In any event, they are not subject to the provisions in the final judgment about which the Burnses complain.

Merle's construction of "Townsite streets and alleys" as including streets and alleys that the final judgment specifically recognizes are now private property is not reasonable. We hold that the judgment is not vague or unenforceable.

## *Tortious interference with prospective contract*

Ramirez, Dryden, and Dermish alleged that Alvin tortiously interfered with a prospective contract between them and Rosetta Resources ("Rosetta") for the lease of certain property in the Townsite. The trial court agreed and awarded damages of $150,000 to Ramirez and Dryden, jointly, and $15,000 to Dermish.

> Tortious interference with a prospective contract encompasses five elements:
>
> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Alvin challenges the legal and factual sufficiency of the evidence to support the second, fourth, and fifth elements. Because it is dispositive, we address only the fourth element—whether Alvin's conduct prevented the contract with Rosetta from occurring.

Alvin's original 2012 petition alleges that Rosetta, as one of the named defendants, had trespassed on, and interfered with, streets, alleys and easements which Alvin claimed to own. In 2014, Ramirez hired Dermish to act as his broker to negotiate a deal with Rosetta to lease Townsite Block 98. Approximately three months into the negotiations, Alvin sued Gladiator Energy Services, LLC ("Gladiator") over use of an alley Alvin claimed to own. Gladiator was a tenant of Ramirez and a subcontractor of Rosetta. Two months later, Rosetta called off negotiations for the prospective lease of Block 98.

Ramirez and Dryden[19] contend that Alvin tortiously interfered with the prospective lease with Rosetta in two ways—generally, by interfering with the use of Townsite streets and alleys based on his claim to own those streets and alleys; and specifically, by filing suit against Gladiator and seeking substantial damages arising from Gladiator's use of a Townsite alley.

Ramirez testified that it was his "understanding that the reason the lease agreement was not entered into is because of Alvin Burns' interference." He similarly testified that it was his "estimation that but for Alvin Burns' interference this lease agreement [with Rosetta] would have occurred." Ramirez made specific note of the fact that the deal with Rosetta fell through approximately two months after Alvin sued Gladiator. Ramirez opined that the fact that Alvin sued Gladiator over property that Ramirez leased to it "would have" negatively affected his negotiations with Rosetta. Finally, Ramirez opined that the deal with Rosetta fell apart because of Alvin's claims to, and interference with, Townsite streets and alleys.

---

[19] Dermish's appeal was dismissed as untimely. Although still an appellee in relation to Alvin's and Merle's appeals, Dermish did not file an appellee's brief. Dryden's interest in the Rosetta lease was as Ramirez's business partner.

Dermish similarly testified that he believed that Rosetta's contentious history with Alvin and the fact that Alvin sued Ramirez's tenant caused the negotiations with Rosetta to fail. Ramirez and Dryden also rely on an email from Ramirez to Dermish in which Ramirez states that Rosetta had been advised not to enter the lease until the lawsuit with Burns settled.

As to the first contention—that the Rosetta deal fell apart because of Alvin's claims to, and interference with, Townsite streets and alleys—Ramirez's and Dermish's testimony is conclusory, speculative, and constitutes no evidence. *Bustamante v. Ponte*, 529 S.W.3d 447, 462 (Tex. 2017) (evidence is conclusory if witness simply states a conclusion without explanation or factual substantiation; conclusory evidence lacks probative value even if not objected to); *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (testimony is speculative if based on guesswork or conjecture).

In addition, Ramirez and Dryden essentially concede that Alvin's claims to, and interference with, Townsite streets and alleys did *not* cause the prospective Rosetta lease deal to fail. They admit in their brief (and it is established in the record by undisputed evidence) that (1) Alvin had claimed ownership of Townsite streets and alleys since the inception of this lawsuit in 2012, (2) Rosetta had been aware of those claims since 2012 because it was a named defendant in the lawsuit, and (3) "[t]his did not cause Rosetta to shy away from Block 98 as a potential business site, and from negotiating for its long term lease with [Ramirez and Dryden] in 2014." These facts conclusively negate the contention that Alvin's claims to, and interference with, Townsite streets and alleys prevented the prospective lease deal with Rosetta from occurring.

Concerning their second contention—that the Rosetta deal fell apart because of Alvin's suit against Gladiator—Ramirez's and Dryden's theory is that Rosetta was not deterred from leasing Block 98, even though it was already a named defendant in Alvin's lawsuit, because Alvin only sought injunctive relief against it. They argue that Alvin's later suit against Gladiator for

damages arising from its use of leased property would have caused Rosetta concern about facing similar damage claims if it leased Block 98. This concern, they contend, is what caused Rosetta to decline to lease Block 98.

Ramirez's and Dermish's testimony that the deal with Rosetta fell through because of the Gladiator suit is conclusory and speculative. Ramirez and Dermish did not offer any evidence from any representative or decision-maker with Rosetta explaining the actual reason for its decision. The email on which they rely is neither to nor from Rosetta. It is Ramirez's second-hand explanation to Dermish of his understanding of Rosetta's decision.

The evidence in the present case "lacks any clear and specific details" for the reasons for Rosetta's decision. *Holt Tex., Ltd. v. M&M Crushed Stone Prod., Inc.*, No. 04-17-00621-CV, 2018 WL 3998661, at *6 (Tex. App.—San Antonio Aug. 22, 2018, no pet.) (mem. op.) (party asserting tortious interference with prospective contract did not present any affidavits from decision-maker regarding the reason for its decision); *Van Der Linden v. Khan*, 535 S.W.3d 179, 195 (Tex. App.—Fort Worth 2017, pet. denied) (party did not offer affidavit from "the one person who personally knew why he refused to go forward with the alleged contract"); *Schimmel v. McGregor*, 438 S.W.3d 847, 860–61 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (noting absence of any affidavits or admissible evidence from decision-maker).

The mere fact that negotiations with Rosetta ended only two months after Alvin sued Gladiator does not demonstrate any causal link between the two. *See Holt*, 2018 WL 3998661, at *6 ("roughly contemporaneous[]" denial of loan and credit reference did not establish that credit reference caused denial of loan); *Van Der Linden*, 535 S.W.3d at 195 (temporal proximity between conduct and decision may give rise to suspicion of causation, but "conjecture, guess, or speculation will not survive a proximate cause sufficiency challenge"); *MJS & Assocs., L.L.C. v. Master*, 501 S.W.3d 751, 758 (Tex. App.—Tyler 2016, pet. denied) ("The mere fact that LHC terminated its

contract three days after MJS disclosed documents is not evidence of a causal link. Such a leap would be speculation."); *Schimmel*, 438 S.W.3d at 860–61 (conduct roughly contemporaneous with decision does not establish causal connection).

Without clear and specific details in the record for Rosetta's decision, the trial court's finding of causation is not supported by legally sufficient evidence. *See Holt*, 2018 WL 3998661, at *6; *Van Der Linden*, 535 S.W.3d at 195. The judgment is reversed insofar as it awards damages to Ramirez, Dryden, and Dermish for tortious interference with prospective contract. Judgment is rendered that those parties take nothing on that claim. Because of this holding, we do not address Ramirez's and Dryden's cross-appeal issue asserting that they conclusively established a greater amount of damages than the trial court awarded.

### *Breach of contract by Merle*

Ramirez and Dryden acquired Block 98 from Merle in September 2001. The deed referenced the Townsite plat, which showed Flores Avenue as a public thoroughfare. At the time they purchased Block 98, Flores Avenue was behind a fence erected by Merle. Shortly after the conveyance to Ramirez and Dryden, though, Merle removed the fence and opened that street to public use. In March 2014, however, Merle intervened in the present lawsuit and joined Alvin in claiming fee simple ownership of Townsite streets and alleys, including Flores Avenue. Ramirez and Dryden alleged that this constituted a breach of contract by Merle, which caused them to suffer $360,000 in damages from the loss of the prospective Rosetta lease. The trial court entered a take-nothing judgment on this claim.

On appeal, Ramirez and Dryden argue that they conclusively proved their breach of contract claim. "In reviewing a conclusive evidence point, we must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340 (Tex. 1998); *see City*

*of Keller*, 168 S.W.3d at 816 ("Evidence is conclusive only if reasonable people could not differ in their conclusions.").

"The elements of a breach of contract claim are: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 61 (Tex. App.—San Antonio 2005, pet. denied). We address only the fourth element, as it is dispositive of Ramirez's and Dryden's claim.

Ramirez and Dryden maintain that they conclusively proved that they sustained $360,000 in damages as a result of Merle's alleged breach of contract. Specifically, they assert that the breach caused them to lose a prospective lease with Rosetta under which they would have received $6,000 per month for five years.

We have held above that Ramirez's and Dermish's evidence concerning the reason Rosetta decided not to enter the lease is legally insufficient to support a finding of causation on the tortious interference claim. We hold, similarly, that the evidence adduced does not *conclusively prove* that Merle's alleged breach of contract caused the event that is the foundation of Ramirez and Dryden's claim of damages—the failure of the Rosetta lease deal. As noted above, Ramirez and Dryden have conceded that Alvin claimed ownership of Townsite streets and alleys (which included Flores Avenue) as early as 2012. However, Alvin's claims did not deter Rosetta from seeking to lease Block 98. The mere fact that Merle intervened in the present lawsuit in 2014 and joined Alvin's claim is not probative evidence that Merle's intervention caused the Rosetta deal to fall through. *See Holt*, 2018 WL 3998661, at *6; *Van Der Linden*, 535 S.W.3d at 195. We affirm the trial court's entry of a take-nothing judgment on Ramirez's and Dryden's claim for breach of contract.

*Dermish's attorney's fees*

The trial court found that Dimmit County, the Balderases, Ramirez, Dryden, and Dermish were prevailing parties, and awarded attorney's fees to each. Alvin asserts that the trial court abused its discretion by awarding $5,000 to Dermish for attorney's fees he paid to Warren Weir.[20]

The Declaratory Judgments Act authorizes the award of such reasonable and necessary attorney's fees as are equitable and just. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. A court reviewing an award of fees under this statute "must determine whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were reasonable and necessary. . . ." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

When questioned on the stand by Dermish, Weir testified that he did not bring with him the statement of fees he charged Dermish and did not remember the amount of those fees. When Dermish asked whether it was more or less than $5,000, Weir responded that he did not recall. Dermish then testified that he paid Weir and Rufino Cabello $5,000 for representing him in the case. When asked what services Weir performed to earn that fee, Dermish responded that Weir did "[w]hat lawyers do— he filed a petition, he advised us what we needed to do, and he argued, you know, against the other attorneys." This is the sum total of evidence presented to support Dermish's claim to attorney's fees.

Dermish's testimony provides no basis upon which a court could conclude that a fee of $5,000 was reasonable and necessary. Rather, the testimony is conclusory and wholly lacking in specificity. For example, there is no evidence concerning what services Weir performed and for what purpose; whether the fee was computed on an hourly or flat fee basis; if hourly, how much time was spent and at what hourly rate; or, if a flat fee, what fee was charged for what service. The

---

[20] Weir briefly represented Dermish in this matter. For the bulk of the case, Dermish represented himself.

evidence simply bears no relation to any of the factors traditionally utilized to assess the reasonableness of an attorney's fee. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing "[f]actors that a factfinder should consider when determining the reasonableness of a fee").

Dermish's testimony constitutes no evidence of the reasonableness and necessity of the $5,000 fee award. The trial court abused its discretion by awarding fees in the absence of legally sufficient evidence. *See Bocquet*, 972 S.W.2d at 21. We reverse the award of attorney's fees to Dermish and render judgment that he take nothing on his claim for such fees.

*Remaining parties' attorney's fees*

The trial court awarded attorney's fees of $206,250 to Dimmit County; $25,994 to the Balderases; and $93,523 to Ramirez and Dryden, jointly. While neither the judgment nor the court's findings of fact and conclusions of law specifically says so, it appears that these fees were awarded under the Declaratory Judgments Act. As demonstrated in this opinion, certain of the trial court's declaratory judgment rulings have been affirmed, others have been reversed.

*Remand for reassessment*

Alvin argues that reversal of any portion of the trial court's judgment requires reversal of all of the attorney's fee awards and remand of those claims to the trial court for reassessment. We acknowledge that, when the extent to which a party prevailed has changed on appeal, the practice of the supreme court "has been to remand the issue of attorney fees to the trial court for reconsideration of what is equitable and just." *Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 885 (Tex. 2016). That practice is not warranted in this case.

The parties to whom the trial court awarded attorney's fees prevailed on certain declaratory actions that the Burnses either did not appeal or that we have affirmed. Those same parties opposed Alvin's requested declaration that an easement appurtenant to the Rectangle exists, and Merle's

requested declaration that he retains rights to use the existing water lines. We have reversed both of those declarations.[21] Thus, the parties to whom fees were awarded have now prevailed *more* than they did at trial. They, however, have not urged that the court remand the attorney's fee issue for reconsideration. We therefore decline to disturb the trial court's assessment of attorney's fees merely because some aspects of the judgment have changed. *Cf. Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015) ("When an appellate court reverses a declaratory judgment, it may reverse an attorney's fee award, but it is not required to do so.").

### *Segregation of fees*

Alvin asserts that the court should reverse and remand the awards of attorney's fees because of an alleged failure to properly segregate recoverable fees from unrecoverable fees. Alvin presents argument only as to the Balderases, Ramirez, Dryden, and Dermish, all of whom at some time in the litigation were represented by the same attorney, Ricardo de Anda. Any complaint concerning Dimmit County's segregation of fees is waived. *See* TEX. R. APP. P. 38.1 (brief must contain clear and concise argument for the contentions made).

A party seeking an award of attorney's fees must segregate the fees between claims for which they are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). De Anda testified that he had billed a total of 628 hours on behalf of his clients, combined, for a total fee of $150,616. He testified that $25,994 of that amount was for representing the Balderases on their claim concerning San Mateo. An "inconsequential amount" of that fee (ten hours or $2000) was attributable for work on other claims. De Anda clearly explained that his ultimate goal for the Balderases was opening San Mateo, which goal was fulfilled in the final judgment and which we have affirmed. De Anda's testimony sufficiently

---

[21] Reversal of the judgment on the tortious interference claim has no bearing on this issue because fees were not awarded based on that claim.

segregated the Balderases' recoverable fees (those incurred in relation to the San Mateo declaration) from their unrecoverable fees ($2000). The fact that the trial court did not actually deduct $2000 from the Balderases' fees is a different issue, and one not raised by Alvin on appeal.

De Anda also testified that, after deducting the fees charged to the Balderases, he reduced the remaining fees by 25 percent as "an appropriate segregation given the Court's rulings." Based on this reduction, he requested an award of $93,522 for Ramirez, Dryden, Dermish, and Gladiator. "[A]n attorney's testimony concerning the percentage of hours relating to specific claims is sufficient to satisfy a party's burden to segregate its attorney's fees." *Bexar Cty. Appraisal Dist. v. Abdo*, 399 S.W.3d 248, 255 (Tex. App.—San Antonio 2012, no pet.); *see Tony Gullo Motors*, 212 S.W.3d at 314 ("[a]n opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.").

Alvin complains that de Anda did not subtract the hours he spent on unrecoverable claims and defenses. He also acknowledges in his brief that it is sufficient to demonstrate "a rough percent of the amount attributable to the [recoverable] claim." *Citing Tony Gullo Motors*, 212 S.W.3d at 314 n.83. De Anda's testimony is sufficient to segregate his remaining clients' recoverable fees from unrecoverable fees.

Finally, Alvin argues that de Anda was required to separately identify what fees were charged to Ramirez, Dryden, Dermish, and Gladiator. This argument is raised for the first time in Alvin's reply brief and is, therefore, waived. *See Powell v. Knipp*, 479 S.W.3d 394, 408 (Tex. App.—Dallas 2015, pet. denied) ("Issues raised for the first time in a reply brief are ordinarily waived and may not be considered by an appellate court.").

The trial court's award of attorney's fees is affirmed.

*Conditional appellate attorney's fees*

The trial court also awarded appellate attorney's fees to the prevailing parties. Alvin asks this court to modify the judgment to explicitly state that appellate fees are predicated on the success on appeal of the party to whom the fees are awarded. "It is implicit in a court's judgment, however, that the award of appellate attorney fees is conditioned on a successful appeal." *Spiller v. Spiller*, 901 S.W.2d 553, 560 (Tex. App.—San Antonio 1995, writ denied). It is not necessary to modify the judgment to make this explicit.

The awards of attorney's fees to Dimmit County, the Balderases, Ramirez, and Dryden are affirmed.

**Conclusion**

That portion of the judgment declaring that an easement appurtenant to the Rectangle exists which permits its fee simple owner the right to use Townsite streets and alleys to install, access, maintain and repair water lines/pipelines beneath such streets and alleys is reversed. Judgment is rendered declaring that no such easement appurtenant exists.

That portion of the judgment declaring that Merle retains the right to use the existing pipelines, as reflected in the Pipeline Easement Transfer, for his own personal and agricultural use purposes is reversed. The judgment is modified to omit the language, "with the sole exception that Merle alone retains the right to use such then-existing water lines/pipelines for his own personal and agricultural use purposes, which use does not extend to supplying or delivering water to third parties for oil field fracking or oil well operations." The remainder of the declaration—"that Merle and Alvin do not own, hold or possess any right, license, or privilege to use or enjoy any of the then-existing water lines/pipelines identified in the Pipeline Easement Transfers for any purpose whatsoever including supplying or delivering water for public use"— is affirmed.

That portion of the judgment finding that Merle conveyed to CWSC ownership of the existing physical water lines or pipelines is reversed. The statement that "Merle assigned to CWSC his ownership in, and right to use and possess, the pipeline easements and water lines/pipelines along and adjacent to specific Townsite streets and alleys as reflected by the Pipeline Easement Transfer" is modified to omit the phrase "ownership in."

That portion of the judgment awarding damages to Ramirez, Dryden, and Dermish for tortious interference with prospective contract is reversed. Judgment is rendered that Ramirez, Dryden, and Dermish take nothing on that claim.

That portion of the judgment awarding attorney's fees to Dermish is reversed and judgment is rendered that Dermish take nothing on his claim for attorney's fees.

The judgment is otherwise affirmed.

Rebeca C. Martinez, Justice